***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Taylor. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before Deputy Commissioner Taylor as:
 STIPULATIONS
1. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
2. An employment relationship existed between plaintiff and defendant-employer at all relevant times.
3. Gallagher Bassett Services is the administrator for the employer, a qualified self-insurer.
4. Plaintiff's compensation rate is $532.00 for the September 15, 1998 claim, I.C. File No. 067495.
5. Plaintiff's compensation rate is $560.00 for the June 17, 1999 claim, I.C. File No. 067492.
6. Plaintiff's left knee problems, which arose on September 15, 1998, are due to causes and conditions which are characteristic of and peculiar to his employment with defendant-employer.
7. Plaintiff's right knee problems, which arose on June 17, 1999, are due to causes and conditions which are characteristic of and peculiar to his employment with defendant-employer.
8. Plaintiff's job with defendant-employer increased an employee's risk of developing knee problems such as those suffered by plaintiff.
9. Plaintiff's right and left knee conditions constitute compensable occupational diseases pursuant to N.C. Gen. Stat. §97-53(13).
10. As a result of plaintiff's occupational disease to his left knee he was disabled from September 9, 1998 through November 7, 1998.
11. As a result of plaintiff's occupational disease to his right knee he was disabled from June 17, 1999 through October 2, 1999 and March 20, 2000 through July 1, 2000.
12. Plaintiff contends that as a result of his two occupational diseases he suffered additional disability from July 2, 2000 through the present date and continuing. Defendants contend that plaintiff has not met his burden of proof establishing that he is entitled to any disability benefits pursuant to N.C. Gen. Stat. § 97-29 or § 97-30 after July 1, 2000.
13. The parties stipulated the following exhibits into the evidence of record at the hearing before the Deputy Commissioner:
a. Stipulated Exhibit 1 — plaintiff's medical records
b. Stipulated Exhibit 2 — Industrial Commission forms
c. Stipulated Exhibit 3 — a videotape of machines
 d. Stipulated Exhibit 4 — the IME report and records of Dr. Robert W. Elkins
14. The issue before the Commission is whether plaintiff is entitled to total disability or permanent total disability after July 2, 2000; and, if so, to what other compensation is plaintiff entitled.
 ***********
Based upon all the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before Deputy Commissioner Taylor, plaintiff was 61 years old and was born June 12, 1940. Plaintiff did not finish high school but did obtain a GED. Plaintiff had brief work experience as a mechanic and in construction prior to becoming employed with defendants in 1976. Plaintiff began working for Schlitz, which was purchased by American National Can. For 25 years plaintiff worked in the same facility which manufactured and printed ink labels on empty soda and beer cans.
2. For the last fifteen years of his employment with defendants, plaintiff worked as a maintainer of the decorator machine that places labels on aluminum cans. Plaintiff worked twelve-hour shifts, three to four days per week with some overtime days. Plaintiff had two fifteen minute and one thirty minute break per shift. Plaintiff's job required him to walk up and down steps, walking, kneeling and constantly standing.
3. Plaintiff's job involved changing design plates, cylinders and a blanket on the decorator machine two to ten times per shift. During this changeover process plaintiff ascended and descended seven metal steps several times and knelt on a metal platform and cement floor. The changeover process took 15 to 45 minutes.
4. Once the decorator machine was set with the proper design, cans on a conveyor belt dropped approximately 30 feet from the floor above plaintiff and went through the decorator machine. Once the cans were decorated with the label, they went through an oven to dry the ink. Plaintiff made certain that the decorator machine was properly printing labels on cans. To do so plaintiff ascended and descended seven steps to a platform in order to refill the inkwells on the decorator machine every three to ten minutes. Plaintiff also walked and stood on a cement floor.
5. Up to 40 times per night the conveyor holding the cans jammed and plaintiff had to fix the problem. To do so plaintiff climbed 29 metal steps and either stood or knelt on a metal platform or on top of a metal oven in order to fix the cans. Plaintiff then descended the 29 steps and resumed his job of watching the machine and refilling the ink. On at least one shift plaintiff ascended and descended the 29 steps 45 times in one hour.
6. After performing the maintainer job for a number of years, in the early to mid 1990s plaintiff's knees began to swell and constantly ache. Over time his pain worsened and he began having problems getting up from a kneeling or sitting position and his knees began to give way. Nevertheless, plaintiff continued to work through his pain and difficulties.
7. In mid 1998, plaintiff obtained medical treatment and was referred by his family physician to Dr. Michael E. King, a board certified orthopaedic surgeon with a sub-specialty in knee injuries.
8. Dr. King diagnosed pain in both knees and chondromalacia and internal derangement of the left knee and given that plaintiff's condition was advanced, arthroscopic surgery was immediately scheduled. The operation on the left knee took place on September 15, 1998. Dr. King found a torn lateral meniscus, chondromalacia and a complete absence of articular cartilage on the backside of the kneecap. Dr. King felt these conditions were caused by the wear and tear of the knee related to plaintiff's job.
9. As a result of his left knee condition, plaintiff was temporarily totally disabled from September 9, 1998 through November 7, 1998.
10. During this time plaintiff applied for short-term disability benefits because, based upon his own knowledge and conversations with Susan Watson, employer representative in the human resources department, he did not know that he could file a workers' compensation claim for a condition which developed over a period of time. Plaintiff's application for short-term disability was approved and he received $2,369.84 in benefits. Ms. Watson explained to plaintiff that in order for a condition to be considered work related it must be an injury which was a result of an accident.
11. Plaintiff returned to his regular job duties as maintainer of the decorator machine on November 8, 1998. Plaintiff's symptoms of knee pain, swelling and weakness continued and he returned to Dr. King on June 17, 1999.
12. Dr. King noted that plaintiff's right knee had worsened and diagnosed plaintiff with chondromalacia and internal derangement of the knee aggravated by his work. Dr. King felt these conditions were caused by the wear and tear of plaintiff's job.
13. Dr. King immediately recommended surgery of the right knee which was performed on July 13, 1999. Dr. King found a torn lateral meniscus, a full thickness transcondylar fracture, chondromalacia and inflammation. Plaintiff remained out of work and was temporarily totally disabled as a result of his right knee condition from June 17, 1999 through October 2, 1999.
14. Plaintiff still did not know that he could file a workers' compensation claim for his condition and he received short-term disability benefits in the amount of $4,247.86 while out of work. Plaintiff was again told by Ms. Watson that his knee problems were not compensable as work related under workers' compensation.
15. Plaintiff attempted to return to full duty work as maintainer of the decorator machine on September 27, 1999, but given his pain and symptoms in his knees he could not perform the job duties. The pain and swelling in his knees worsened over time to the point that he could no longer work. Plaintiff testified that if he continued to work he would not be able to walk.
16. Plaintiff's testimony regarding his pain and symptoms and his inability to perform his job is accepted as credible and convincing.
17. Plaintiff testified that his pain following his surgeries was constantly present and continued after he stopped working.
18. Plaintiff returned to Dr. King on March 20, 2000 with reports of increased pain, weakness and swelling and Dr. King recommended physical therapy. Dr. King kept plaintiff out of work and on May 4, 2000 Dr. King took plaintiff out of work indefinitely.
19. Dr. King also indicated that plaintiff had moderate to severe pain and arthritis, which caused swelling, limping and tenderness. Given plaintiff's failed return to work, Dr. King recommended against further attempts to work.
20. Plaintiff again applied for and received short-term disability benefits from March 20, 2000 through July 1, 2000 in the amount of $4,292.57.
21. Plaintiff testified that it was too painful for him to continue to work. He felt he was forced to take an early retirement because he physically could not tolerate the pain and was unable to perform his job duties.
22. When plaintiff was taken out of work indefinitely by Dr. King, plaintiff still did not know that he could file a workers' compensation claim.
23. Due to his inability to work, and his understanding that his gradual onset of pain was not covered by workers' compensation, an understanding which was due in large part to representations made by a human resources representative with defendant, plaintiff chose to take early retirement effective July 2, 2000. Since plaintiff retired early, despite his 25 years of service for defendants, he received a reduced pension and no health insurance from defendants.
24. Plaintiff testified that he would have continued to work but for his knee conditions and that his inability to work as of July 1, 2000 was due to the condition of his knees.
25. Plaintiff filed a Form 18, Notice of Accident to Employer, dated September 13, 2000 for his left and right leg.
26. Defendant filed a Form 61, Denial of Workers' Compensation Claim, on November 15, 2000. Prior to the Deputy Commissioner hearing, defendants admitted compensability for both claims.
27. Plaintiff has continued to suffer from pain, swelling and weakness in his knees. Dr. King has indicated that even if plaintiff could find employment he would be limited to no climbing, stooping, squatting, bending, kneeling, or going up steps and only intermittent standing for a total of two hours out of an eight hour workday, with the remainder of the time in a seated position. Dr. King testified that if plaintiff had not retired, he would not have allowed him to return to work.
28. Plaintiff testified that he has never had a sedentary position. He has no job training or skills to obtain sedentary work.
29. Plaintiff testified that he is unable to stay in one position any period of time. If he sits for too long, he is unable to get up. He is unable to walk for very long and must balance his activities with his continuous pain.
30. Given plaintiff's age, education, lack of work experience and absence of transferable skills, as well as his pain and permanent work restrictions, it would be futile for plaintiff to seek employment.
31. Although plaintiff underwent an independent medical examination performed by Dr. Robert Elkins on April 9, 2002, the Full Commission does not accept Dr. Elkins' findings, and specifically his findings regarding permanent partial impairment, to be credible or convincing. Dr. Elkins saw plaintiff on only one occasion. Greater weight is given to the opinions of Dr. King, the treating physician and surgeon, who saw plaintiff over a lengthy period of time. The Full Commission therefore accepts Dr. King's opinion regarding plaintiff's pain and symptoms and the opinion that plaintiff has a 20% permanent partial impairment to the right leg and a 20% permanent partial impairment of the left leg.
32. Plaintiff's knee conditions are due to causes and conditions which are characteristic of and peculiar to his employment and are not ordinary diseases to which the public is equally exposed.
33. The Full Commission finds the greater weight of the evidence of record indicates plaintiff sustained a compensable occupational disease to his left knee on September 15, 1998 for which he was temporarily totally disabled from September 9, 1998 through November 7, 1998.
34. The Full Commission finds the greater weight of the evidence of record indicates plaintiff sustained a compensable occupational disease to his right leg on June 17, 1999 for which he was temporarily totally disabled from June 17, 1999 through October 2, 1999 and from March 20, 2000 through July 1, 2000.
35. As of July 1, 2000 plaintiff reached maximum medical improvement. Plaintiff's pain is genuine and his testimony regarding his pain, symptoms and abilities is accepted as credible and convincing.
36. Plaintiff has been disabled since July 1, 2000 and continues to be disabled. Defendants have presented no evidence of suitable employment to rebut plaintiff's disability.
37. There is a substantial risk that plaintiff will require medical treatment for his knees for the remainder of his life, including periodic checkups, physical therapy, medication, a gym membership and, in all likelihood, bilateral total knee replacements. Such treatment is necessary to affect a cure, provide relief or lessen plaintiff's disability.
 ***********
Based upon the foregoing stipulations and finds of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable occupational disease on September 15, 1998 to his left knee and a compensable occupational disease on June 17, 1999 to his right knee. N.C. Gen. Stat. § 97-53 (13) Plaintiff has the burden of providing disability, defined as a loss of wage earning capacity. Russell v. Lowe's Product Distribution, 108 N.C. App. 762,425 S.E.2d 454 (1993). Plaintiff can satisfy his burden of proving disability in one of four ways: (1) the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of working in any employment; (2) the production of evidence that he is capable of some work, but that he has, after reasonable effort on his part, been unsuccessful in his effort to obtain employment; (3) the production of evidence that he is capable of some work but that it would be futile because of pre-existing conditions, i.e. age, inexperience, lack of education, to seek other employment; or (4) the production of evidence that he has obtained other employment at a wage less than he earned prior to his injury. Id.
2. Through the production of medical evidence that his pain is genuine and his own credible testimony regarding his pain, symptoms and abilities, plaintiff has proven that he is physically incapable of any employment as a consequence of his compensable occupational diseases. Plaintiff has also shown that even if he were capable of some sedentary work, it would be futile for him to engage in a job search in light of his age, lack of work experience, lack of training and education, lack of transferable skills and physical impairment. Plaintiff has satisfied his burden of proving he has been unable to work as a result of his occupational diseases from September 9, 1998 through November 7, 1998; June 17, 1999 through October 2, 1999; and March 20, 2000 continuing through the present date until further order of the Commission. N.C. Gen. Stat. § 97-29.
3. Defendants have failed to present competent, credible evidence to rebut plaintiff's presumption of disability. Defendants have the burden to show not only that suitable jobs are available, but also that plaintiff is capable of getting a job taking into account his physical and vocational limitations. Kennedy v. Duke University Medical Center,101 N.C. App. 24, 398 S.E.2d 677 (1990). Defendants have failed to meet this burden and plaintiff is therefore entitled to ongoing disability benefits.
4. Defendants are entitled to a week-by-week credit for any disability paid to plaintiff under an employer-funded disability plan during periods of plaintiff's temporary total disability benefits. N.C. Gen. Stat. § 97-42.
5. In a compensable occupational disease claim, medical compensation shall be provided by the employer. N.C. Gen. Stat. § 97-25. Defendants shall be responsible for payment of all medical treatment incurred by plaintiff as a result of his compensable occupational diseases. To the extent that any health carriers or other sources, including plaintiff, have paid any medical expenses as a result of these occupational diseases, defendants shall be responsible for reimbursing such parties. There is a substantial risk of the necessity of future medical compensation as a result of plaintiff's occupational diseases, including future medication, gym memberships, physical therapy, doctor's visits and bilateral total knee replacements. Defendants shall therefore be responsible for the payment of all future medical compensation for plaintiff's knee conditions for plaintiff's lifetime. N.C. Gen. Stat. § 97-25.1.
6. Plaintiff is entitled to a permanent partial disability rating to his left knee of 20 % and a permanent partial disability rating to his right knee of 20%. N.C. Gen. Stat. § 97-31(15). Plaintiff is deemed to have selected the more munificent remedy under the statutes, which is compensation for total disability. N.C. Gen. Stat. § 97-29.
 ***********
Based upon the foregoing findings of fact and conclusions of law the Full Commission enters the following:
 AWARD
1. Defendants shall pay plaintiff total disability benefits from September 9, 1998 through November 7, 1998 at a rate of $532.00 as compensation for his September 15, 1998 occupational disease claim. As such benefits have already accrued, they should be paid to plaintiff in a lump sum.
2. Defendants shall pay total disability benefits at a rate of $560.00 per week from June 17, 1999 through October 2, 1999 and from March 20, 2000 through the present date and continuing until further order of the Commission. To the extent that such benefits have accrued, they shall be paid to plaintiff in a lump sum.
3. Defendants are entitled to a week-by-week credit for any disability benefits paid to plaintiff under an employer-funded plan, to be deducted from the lump sum payment to plaintiff owed pursuant to paragraphs 1 and 2 of the Award.
4. Defendants shall pay all medical compensation incurred as a result of plaintiff's occupational diseases. To the extent that such compensation has already been paid by a healthcare provider, plaintiff or any other source, defendants shall be responsible for reimbursement of such payments. Defendants shall also be responsible for payment of all future lifetime medical treatment for plaintiff's knee conditions, including medication, periodic doctor's visits, physical therapy, a health club membership and bilateral total knee replacements.
5. An attorney fee of 25% of the benefits awarded to plaintiff in paragraphs 1 and 2 of this award is approved for plaintiff's counsel. Defendants shall deduct this amount and send it directly to plaintiff's counsel.
6. Defendants shall pay the costs.
This the ___ day of July 2003.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER
LKM/kjd